UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **MOSES GREEN** | **CIVIL ACTION** |
| **VERSUS** | **NO. 14-2072** |
| **N. BURL CAIN, WARDEN** | **SECTION "S"(5)** |

**REPORT AND RECOMMENDATION**

This matter was referred to the undersigned United States Magistrate Judge to conduct a hearing, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. §636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts. Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing. See 28 U.S.C. § 2254(e)(2). For the following reasons, **IT IS RECOMMENDED** that the petition for *habeas corpus* relief be **DISMISSED WITH PREJUDICE** as untimely.

I. *Procedural and Factual History*

Petitioner, Moses Green, is a state prisoner incarcerated in the Louisiana State Penitentiary in Angola, Louisiana. On May 26, 1994, following a two-day jury trial in Orleans Parish, he was found guilty as charged of first degree murder.[1] The Louisiana Fourth Circuit Court of Appeal summarized the facts determined at trial as follows:

---

[1] State Rec., Vol. 1 of 3, Orleans Parish Grand Jury Indictment; Minute Entries dated May 25-26, 1994.

At trial, Daisy Doubleday, the victim's sister, testified that her brother Herman Doubleday worked for Kentwood Spring Water for seven years.

Officer John Treadaway, a firearms examiner for the New Orleans Police Department's crime lab, testified that the three bullets recovered from Herman Doubleday's body by the Coroner's Office were fired from a .32 caliber Smith and Wesson revolver. He testified that this type of weapon was unlikely to be discharged accidentally.

Detective Anthony Small of the homicide division of the New Orleans Police Department testified that on June 30, 1993, he investigated a murder in the 1900 block of Piety Street. When he arrived, he found Herman Doubleday lying supine in the street in front of 1911 Piety Street with multiple gunshot wounds. Herman Doubleday was lying near empty Kentwood Water bottles and scattered change. He located two witnesses who were unable to make an identification. In response to a witness who later came forward, Detective Small arrested Moses Green.

Dr. William P. Newman, III, a pathologist with LSU School of Medicine who performs autopsies for the Orleans Parish Coroner's Office, testified that he performed the autopsy on Herman Doubleday. He testified that the victim had suffered three gunshot wounds: one to the left of his face causing extensive cranial cerebral injury, which was certainly fatal; one to his upper left arm, chest and left lung; and one to his right lung, either of which could also have been fatal. He testified that these shots were fired from approximately eighteen inches to two feet away.

Officer Albert Jones, a police officer assigned to the Fifth District, testified that when he arrived at the scene of the shooting, he checked a white male, who was bleeding from the face, head, and upper body, for life signs and found none. He then summoned the emergency unit and maintained the scene until the homicide detectives arrived.

Detective Jerry Londen of the homicide division of the New Orleans Police Department identified Green in court. He testified that he arrested Green.

Detective Marco Demma of the homicide division of the New Orleans Police Department testified that he took a tape-recorded statement from Tyronne Joseph on July 3, 1993. He testified that he obtained a .32 caliber revolver from

2

Joseph.

Sergeant John Evans, a New Orleans Police officer assigned to the District Attorney's office, testified that [sic] met with Douglas Jones and Joseph, and walked with Joseph over to the homicide division where he turned in a .32 caliber revolver.

Douglas Jones testified that he contacted Sergeant Evans on behalf of Joseph.

Tyronne Joseph testified that at the time of the shooting he lived with his girlfriend, Verna Eugene, in the lower ninth ward. He testified that he has known Green, with whom he attended school and has worked, for most of his life. He testified that on the day of the shooting, he spoke with Verna after which he went looking for Green on his bicycle. He found Green, who was carrying some clothing, near the corner of Claiborne and Robertson at approximately 2 p.m. He gave Green a ride on his handlebars approximately eight blocks to Green's sister's house. When they arrived, Green told him that he had robbed a Kentwood driver, shooting him three times, and that he believed that he was dead. Green showed him a .32 caliber revolver, which Joseph testified smelled like it had been fired recently, that Green was carrying beneath the clothing. Green also showed him a dark colored wallet that contained Herman Doubleday's gymnasium membership card. Joseph testified that he then went home to take a shower.

Joseph testified that he next saw Green at approximately 3 p.m. that day when he came to Joseph's home to get his hair cut and to give him a brown paper bag that contained the revolver. Joseph testified that he was concerned because he had two prior convictions for simple robbery and simple burglary. He testified that Jones put him in touch with Sergeant Evans who took him to the homicide division to make a statement and to turn in the gun. Joseph's statement was introduced into evidence. On cross-examination, Joseph admitted that he has received a $1,000 reward, and that if Green is convicted he could receive a $10,000 reward.

Verna Eugene testified that Joseph was her boyfriend who lived with her at the time of the shooting. She testified that she knows Green through Joseph and identified him in court. She testified that on the day of the shooting she answered the door when Green arrived carrying some clothes. When Green asked for Joseph, she told him that he wasn't home in accordance with Joseph's

3

wish not to be disturbed. She testified that Green said, "Damn," looked like something was wrong, and left. When she told Joseph that Green had been there, Joseph left for about thirty minutes. She testified that this was the only time that Joseph left the house that day. When Joseph returned he took a shower. Green came back at approximately 3 p.m. carrying a paper bag that contained a gun.

Kevin Lender, an attorney with the public defender's office, testified that he observed a physical line-up involving Green. He described the line-up and testified that the two witnesses were unable to make an identification.

Detective Keith Valteau of the New Orleans Police Department testified that he had been unable to serve subpoenas on the two witnesses who had participated in the identification procedure and had been interviewed by detective Small.[2]

Following the penalty phase proceedings on May 27, 1994, the jury reported that it was hopelessly deadlocked with regard to a sentencing recommendation.[3] Accordingly, on June 3, 1994, the trial court sentenced Green to life imprisonment without benefit of probation, parole or suspension of sentence.[4]

On December 28, 1995, Green's conviction and sentence were affirmed on appeal following review for errors patent.[5] Green did not seek further review in the Louisiana Supreme Court.

---

[2] State Rec., Vol. 2 of 3, *State v. Green*, 95-KA-0203 (La. App. 4th Cir. Dec. 28, 2005) (unpublished decision).

[3] *Id.*, Minute Entry, May 27, 1994.

[4] *Id.*, Minute Entry, June 3, 1994 (sentencing).

[5] State Rec., Vol. 2 of 3, *State v. Green*, 95-KA-0203 (La. App. 4th Cir. Dec. 28, 2005) (unpublished decision).

On or about September 15, 1998, Green filed an application for post-conviction relief with the state district court.[6] In that application, he asserted four instances of alleged ineffective assistance of trial counsel, including the failure to call two eyewitnesses to the crime who could have exonerated Green; to object to Green's being tried in prison garb; to effectively impeach the testimony of the State's star witness, Tyronne Joseph, which Green asserts was induced by a reward; and to investigate and seek an order for Tyronne Joseph to be placed in a physical lineup from which Green claimed the real perpetrator would have been selected by the witnesses.  He also asserted one claim of ineffective assistance of appellate counsel for failure to brief any assignments of error on direct appeal.  When Green did not receive a ruling by the state district court on his post-conviction relief application, he applied to the Louisiana Fourth Circuit Court of Appeal for a writ of mandamus.  The court of appeal independently reviewed the claims raised and denied them as meritless.[7]  Green did not

---

[6] State Rec., Vol. 3 of 3, Uniform Application for Post-Conviction Relief, signed by Green on September 15, 1998.  Federal *habeas* courts must apply Louisiana's "mailbox rule" when determining the filing date of a Louisiana state court filing, and therefore such a document is considered "filed" as of the moment the prisoner "placed it in the prison mail system." *Causey v. Cain*, 450 F.3d 601, 607 (5th Cir. 2006). If that date cannot be gleaned from the state court record with respect to the filing, this Court will use the signature date of the applications as the filing date, in that the various applications were obviously placed in the mail no earlier than the date they were signed. In those instances where no signature date appears on a document and no other evidence is available, the Court will look to the file-stamp placed on the document by the clerk of court.

[7] *Id.*, *State v. Green*, 99-K-0032 (La. App. 4th Cir. March 1, 1999) (unpublished writ decision).

pursue further review of these claims in the Louisiana Supreme Court.

About fourteen years later, on or about March 20, 2013, Green filed a "supplemental" post-conviction relief application with the state district court.[8] He argued that the application was timely filed and not successive based on *Martinez v. Ryan*, 132 S.Ct. 1309 (2012), because he was denied counsel on state post-conviction review in 1998. Green also reurged his claim of ineffective assistance of trial counsel based on the failure to call the two eyewitnesses who would have exonerated him. On June 6, 2013, the state district court denied relief, finding *Martinez* inapplicable and the application untimely and without merit.[9] On July 22, 2013, the Louisiana Fourth Circuit denied his supervisory writ application, finding no error in the lower court's ruling.[10] On April 4, 2014, the Louisiana Supreme Court denied his related writ application because it was untimely under state law, Louisiana Code of Criminal Procedure article 930.8 and *Glover v. State*, 93-2330 (La. 9/5/95), 660 So.2d 1189.[11]

On September 8, 2014, Green filed the instant federal application seeking *habeas corpus*

---

[8] The post-conviction relief application bears a typewritten date of March 20, 2013. The Court notes that the state district court's judgment denying relief references a filing date of June 3, 2013. However, the State's calculation is based on the earlier date that appears on the application and this Court accepts that filing date as well.

[9] State Rec., Vol. 3 of 3, Judgment of state district court denying PCR signed June 6, 2013.

[10] *Id.*, *State v. Green*, 2013-K-0973 (La. App. 4th Cir. July 23, 2013) (unpublished writ ruling).

[11] *State ex rel. Green v. State*, 2013-KH-2020 (La. 4/4/14), 135 So.3d 633; State Rec., Vol. 3 of 3.

6

relief.[12]  He asserts as his only ground for relief that his trial counsel was constitutionally ineffective in failing to call two eyewitnesses whose testimony could have exonerated him.

The State argues that Green's petition is untimely.  For the following reasons, the Court agrees and finds the petition to be untimely.

II.  *Analysis*

    A.  *Statute of Limitations*

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified at 28 U.S.C. § 2241 *et seq.*, governs the filing date for this action because petitioner filed his federal *habeas* petition after the AEDPA's effective date. *Lindh v. Murphy*, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).  The AEDPA includes a one-year period of limitations for *habeas* petitions brought by prisoners challenging state court judgments.  Title 28 U.S.C. § 2244(d) provides, in pertinent part:

    (1)    A 1–year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—

        A.    the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
        B.    the date on which the impediment to filing an application created

---

[12] Rec. Doc. 1, p. 36 of 36. "A prisoner's habeas application is considered 'filed' when delivered to the prison authorities for mailing to the district court." *Roberts v. Cockrell*, 319 F.3d 690, 691 n. 2 (5th Cir.2003). The record reflects that Green delivered his petition to LSP officials for mailing on September 8, 2014.

> by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
> C. the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
> D. the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

The State argues that Green's petition is time-barred pursuant to Subsection (A), which requires that a petitioner bring his Section 2254 claims within one (1) year of the date on which his underlying criminal judgment becomes "final." As to finality, the United States Fifth Circuit Court of Appeals has explained:

> The statute of limitations for bringing a federal habeas petition challenging a state conviction begins to run on "the date on which the [state] judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). When a habeas petitioner has pursued relief on direct appeal through his state's highest court, his conviction becomes final ninety days after the highest court's judgment is entered, upon the expiration of time for filing an application for writ of certiorari with the United States Supreme Court. *Roberts v. Cockrell*, 319 F.3d 690, 693 (5th Cir.2003). However, "[i]f the defendant stops the appeal process before that point," ... "the conviction becomes final when the time for seeking further direct review in the state court expires." *Id*. at 694; *see also Foreman v. Dretke*, 383 F.3d 336, 338 (5th Cir.2004) ( Section 2244(d)(1)(A) gives alternative routes for finalizing a conviction: either direct review is completed or the time to pursue direct review expires).
>
> Although federal, not state, law determines when a judgment is final for federal habeas purposes, a necessary part of the finality inquiry is determining whether the petitioner is still able to seek further direct review. *See Foreman*, 383 F.3d at 338–39. As a result, this court looks to state law in determining how long a prisoner has to file a direct appeal. *See Causey v. Cain*, 450 F.3d 601, 606 (5th

Cir.2006); *Roberts*, 319 F.3d at 693.

*Butler v. Cain*, 533 F.3d 314, 317 (5th Cir.2008).

In this case, the Louisiana Fourth Circuit Court of Appeal affirmed Green's conviction and sentence on December 28, 1995. He did not request a rehearing. Under Louisiana law, he then had 30 days to file a writ application with the Louisiana Supreme Court to challenge that judgment. Louisiana Supreme Court Rule X, § 5(a). Because he filed no such application within that deadline, his state criminal judgment became final for purposes of the AEDPA on January 29, 1996.[13] *See Butler*, 533 F.3d at 317-18. However, Green's federal limitation period would not start to run until the enactment date of the AEDPA, or on April 24, 1996, under the rule of *Flanagan v. Johnson*, 154 F.3d 196, 201–02 (5th Cir.1998). Thus, pursuant to the general rule set forth in 28 U.S.C. § 2244(d)(1), Green's federal limitations period would have commenced running on April 24, 1996 and he would have had until April 24, 1997 to file his federal *habeas* petition.

Title 28 U.S.C. § 2244 also provides, however, for an alternate start date of the federal limitations period if the state created an impediment to filing, the claim relies on a newly recognized constitutional right made retroactive to cases on collateral appeal, or the factual predicate of the claim could not have been discovered through due diligence. *See* 28 U.S.C. §§ 2244(d)(1)(B)-(D). Here, Green relies on the Supreme Court's decision in *Martinez v. Ryan*, 132

---

[13] The thirtieth day was Saturday, January 27, 1996, leaving the final day to fall on the next nonholiday, Monday, January 29, 1996. La. C.Cr.P. art. 13; Fed.R.Civ.P. 6(a)(1)(C).

9

S.Ct. 1309 (2012), to argue that his *habeas* petition is timely filed pursuant to a newly recognized constitutional right to post-conviction counsel.[14] Subsection (d)(1)(C) provides that the one-year limitations period begins "on the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review." 28 U.S.C. § 2244(d)(1) (C).

Green's reliance on *Martinez* is misplaced. The Supreme Court in *Martinez* recognized that ineffective assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial. *Martinez*, 132 S.Ct. at 1315. The equitable ruling in *Martinez* did not encompass, much less excuse, the untimely filing of a federal *habeas* petition. *See Arthur v. Thomas*, 739 F.3d 611, 631 (11th Cir.2014) (holding that "the *Martinez* rule explicitly relates to excusing a procedural default of ineffective-trial-counsel claims and does not apply to AEDPA's statute of limitations or the tolling of that period."); *Smith v. Rogers*, No. 14–0482, 2014 WL 2972884, at *1 (W.D.La. July 2, 2014); *Falls v. Cain*, No. 13–5091, 2014 WL 2702380, at *3 (E.D. La. June 13, 2014) (Order adopting Report). *Martinez* certainly does not suggest, as Green implies, that states in effect are required to appoint pre-filing counsel for all inmates following their convictions to assure

---

[14] Rec. Doc. 1, Memorandum in Support, p. 5.

the timely filing of state—much less federal—petitions.[15] *Martinez*, 132 S.Ct. at 1319-20.

Because Green's conviction became final prior to the enactment of the AEDPA and he is not entitled to any alternative start date, the federal limitations period began to run on April 24, 1996, when the AEDPA became effective and expired on April 24, 1997. Barring statutory or equitable tolling, Green's *habeas* petition is untimely.

B. *Statutory and equitable tolling*

Although the federal limitations period is subject to statutory and equitable tolling, Green makes no argument that such tolling would render his *habeas* petition timely. Nor does the record support any such claim.

The AEDPA itself provides for interruption of the one-year limitations period. Section 2244(d)(2) provides that "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C.

---

[15] Furthermore, as the State notes, even if *Martinez* could be considered a new constitutional right applicable to Green, he still did not timely file within the applicable one-year limitations period. The *Martinez* decision was rendered on March 20, 2012. If that date served as the alternate start date, then Green would have had until March 20, 2013 to file his federal application. Giving him the benefit of the doubt, he filed a post-conviction application in the state district court on the final day of the federal limitations period, or March 20, 2013, which theoretically could have served to interrupt the running of the limitations period, but would have afforded him no additional un-tolled days remaining following the resolution of collateral review. The Louisiana Supreme Court denied relief on April 4, 2014. At this time, the federal limitations period expired. Green did not file his federal application in this Court until September 8, 2014.

11

§ 2244(d)(2). However, in Green's case, the federal statute of limitations period ran without interruption for one year, until April 24, 1997, when it expired. Green had no properly filed state-court application for post-conviction relief or other collateral review pending in any of the state courts during that period. His first application for post-conviction relief was not submitted to the state district court for filing until September 15, 1998. That application, filed well more than one year after expiration of the AEDPA one-year statute of limitations, provided no tolling benefit under the statute. *Scott v. Johnson*, 227 F.3d 260, 263 (5th Cir.2000). Accordingly, Green is not entitled to the benefit of statutory tolling.

The one-year limitations period may also be equitably tolled in rare and exceptional circumstances in which a petitioner can establish that he diligently pursued his rights and that an extraordinary circumstance hampered his ability to file his petition within the one-year federal limitations period. *See Pace v. DiGuglielmo*, 544 U.S. 408, 418, 125 S.Ct. 1807, 161 L.Ed.2d 669 (2005). A petitioner bears the burden of proof to establish entitlement to equitable tolling. *Alexander v. Cockrell*, 294 F.3d 626, 629 (5th Cir. 2002).

Other than relying on *Martinez*, as previously discussed, Green offers no explanation for his failure to pursue his claims more than a decade earlier. He clearly does not meet the diligence requirement for equitable tolling. *See Tsolainos v. Cain*, 540 F. App'x 394, 400 (5th Cir.2013) (17–month delay not reasonable diligence). Indeed there is no evidence of Green's diligence. Instead, he relies on the inapplicable *Martinez* decision to present a claim that was available to him immediately after trial. There is no basis to equitably toll the federal

limitations period in this case.

C. *Actual innocence*

Finally, actual innocence, if proved, may overcome the expiration of AEDPA's one-year statute of limitations. *McQuiggin v. Perkins*, 133 S.Ct. 1924, 1928, 185 L.Ed.2d 1019 (2013). To be credible, however, "such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence — whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence — that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). The Supreme Court has cautioned, however, that "tenable actual-innocence gateway pleas are rare: '[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.' " *McQuiggin*, 133 S.Ct. at 1928 (quoting *Schlup v. Delo*, 513 U.S. at 329.

As the State points out, Green does not make any express argument under *McQuiggin* that he is actually innocent of the murder to excuse his untimeliness. But he does argue in relation to his substantive claim that two eyewitnesses, whom his counsel failed to call at trial, were unable to identify him in a photographic lineup and he identified another person, Corey Richardson, as the real perpetrator. Green contends the testimony of these two eyewitnesses would have exonerated him.

Even assuming Green makes an argument of actual innocence based on his allegations

13

and purported "new" evidence, he fails to show that he is factually innocent of the murder of Herman Doubleday. Green has not demonstrated that no reasonable juror would have convicted him of murder had the testimony of the two eyewitnesses been presented at trial.

Although the police identified Kimberly Cratin and Kenneth Howard as eyewitnesses to the murder, neither witness was ever able to positively identify Green as the perpetrator.[16] Cratin made no identification and explained to detectives that she was unable to identify anyone from a frontal view because she only got a side view of the perpetrator. Howard expressed the same concern to detectives when shown the photographic lineup and was unable to identify Green as the perpetrator. When presented with the lineup containing Richardson's photograph, Howard candidly admitted he "wasn't positive if any of the photographs in the line-up was the perpetrator." He said that he knew the person depicted in photograph #4 (Richardson) as someone he had frequently seen before in the Florida Housing Project, and that he could be the perpetrator but he was not positive. The detective's narrative described this as a "tentative" identification. Thus, the record flatly contradicts Green's assertion that the eyewitnesses positively identified Richardson, rather than Green, as the perpetrator. The two eyewitnesses' inability to identify Green is hardly exculpatory.

Additionally, when weighed against the evidence presented at trial, Green has failed to establish that no reasonable juror could have convicted him in light of these eyewitness

---

[16] State Rec., Vol. 1 of 3, Police Report with narrative by Detective Anthony Small.

accounts and unsuccessful or tentative identifications. Given Tyronne Joseph's compelling trial testimony regarding his interaction with Green on the afternoon of the murder — namely his account that Green was carrying a change of clothes and was in possession of the victim's wallet and the murder weapon, and that Green confessed he had just robbed and then shot the victim three times and believed he was dead — Green fails to show that no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt if these eyewitnesses had testified at trial. In fact, in weighing the evidence in this case, the jury did consider Detective Small's testimony at trial regarding the photographic lineup and preliminary "tentative" identification of Richardson. The jury also took into account Joseph's possible financial incentive for his testimony because he acknowledged there was a substantial monetary reward offered in connection with the case, but maintained that he did not come forward for this reason. The jury still decided to credit Joseph's testimony. Green's purported evidence in the form of eyewitness testimony from Cratin and Howard as to their inability to positively identify a perpetrator does not satisfy the rigorous actual innocence standard under *Schlup*.

Because the instant petition was filed after the federal limitations period expired and Green has failed to demonstrate that tolling principles render his petition timely, or that he is entitled to review of his claims through the "actual innocence" gateway, his federal *habeas* petition should be dismissed with prejudice as untimely.

**RECOMMENDATION**

15

**IT IS RECOMMENDED** that Green's application for federal *habeas corpus* relief be **DISMISSED WITH PREJUDICE** as untimely.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir.1996) (en banc).[17]

New Orleans, Louisiana, this  3rd  day of      August     , 2015.

　　　　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　　　MICHAEL B. NORTH
　　　　　　　　　　　　　　　　　　　　　　　UNITED STATES MAGISTRATE JUDGE

---

[17] *Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.

16